# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GREAT AMERICAN E & S INSURANCE COMPANY, individually, and as assignee of claims from its insured C3 MANUFACTURING LLC, a Colorado company,<br><br>Respondent,<br><br>v.<br><br>HOUSTON CASUALTY COMPANY,<br><br>Defendant,<br><br>GORDON REES SCULLY MANSUKHANI, LLP, SINARS SLOWKIOWSKI TOMASAKA LLC, J. SCOTT WOOD, and CHRISTOPHER FURMAN,<br><br>Petitioners. | No. 87386-5-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

BIRK, J. — A liability insurer asserts that it had to pay a greater settlement to a claimant suing its insured because defense counsel it retained allegedly committed legal malpractice. The question before us is whether Washington public policy prohibits the insured from assigning their legal malpractice claims against retained defense counsel to the liability insurer. We hold that Washington public policy prohibits such an assignment where there is potential conflict between the insurer and the insured, as there is where, as here, the insurer defended under a

reservation of rights to deny coverage. We reverse the superior court's denial of defense counsel's motion for judgment on the pleadings.

I

Because we are reviewing a ruling on a motion for judgment on the pleadings under CR 12(c), we accept as true the factual allegations contained in the complaint. Silver v. Rudeen Mgmt. Co., 197 Wn.2d 535, 542, 484 P.3d 1251 (2021). According to the complaint of Great American E & S Insurance Company, Michael Vandivere fell while climbing at Vertical World, an indoor climbing gym. Vandivere filed a personal injury lawsuit against Vertical World. In Vandivere's second amended complaint he named C3 Manufacturing LLC as a defendant in the lawsuit. He alleged that C3 was liable for his injuries because it manufactured the auto belay device, which, due to alleged product defects, had failed to arrest his fall. At the time of Vandivere's injuries, C3 was insured by two applicable liability insurance policies, a $1 million primary policy issued by Great American and a $4 million excess umbrella policy issued by Houston Casualty Company.

C3 tendered Vandivere's claims to Great American. Great American defended under a full reservation of rights, retaining J. Scott Wood, then an attorney at Foley & Mansfield PLLP, to represent C3. In January 2022, Wood left Foley & Mansfield and joined Sinars Slowikowski Tomasaka LLC, and C3 retained Sinars. While at Sinars, Wood worked with Christopher Furman on the Vandivere lawsuit. Between April 2022 and April 2023, Furman visited two Vertical World gyms, including the gym where Vandivere was injured, "dozens of times." Neither

2

Furman nor Wood supplemented C3's discovery responses to notify Vandivere of Furman's contact with Vertical World staff.

Houston Casualty later notified C3 that it was rescinding its $4 million excess umbrella policy based on alleged material misrepresentations that it said C3 made on its insurance policy application. Wood, who had earlier disclosed to Vandivere the coverage of the Houston Casualty policy, failed to update C3's discovery responses with Houston Causality's rescission. C3 disputed Houston Casualty's rescission attempt. Gordon Rees Scully Mansukhani LLP represented Houston Casualty in its coverage dispute with C3.

In April 2023, Wood left Sinars and joined Gordon Rees. For two weeks, Wood continued to represent C3 at Gordon Rees while the firm was also representing Houston Casualty, creating a conflict of interest. In May 2023, Wood and Gordon Rees disclosed the conflict and moved to withdraw as C3's counsel. Great American was "forc[ed]" to "bring in a new law firm to defend C3 only weeks before the scheduled trial. C3's new counsel notified the parties of Houston Casualty's attempted rescission of the $4 million excess umbrella policy. And, also in May 2023, Vertical World disclosed to Vandivere that Furman had visited its gyms "more than two dozen times," even though Furman's contact with Vertical World had not been disclosed in response to Vandivere's discovery requests.

Vandivere moved for sanctions against C3. The court granted monetary sanctions and "indicated it would provide a jury instruction that would allow the jury

to make a negative inference from what it found to be C3's discovery misconduct."[1] Vandivere alleged that, because of this misconduct, Great American was "obligated to fund the entirety of any judgment, irrespective of its limit." C3 and Great American settled the lawsuit with Vandivere, with Great American agreeing to pay $5 million, in addition to court ordered sanctions against C3 and Sinars. According to Great American, any amount over $1 million "should have been paid by Houston Casualty (or by one or more of [Gordon Rees, Sinars, Wood, or Furman])." As part of the settlement agreement between C3 and Great American, C3 agreed to "assign, transfer, and convey to Great American all of C3's rights, title and interest in any and all claims, rights, privileges, and causes and choses of action" against Sinars and Gordon Rees, including legal malpractice claims.

In September 2023, Great American filed a complaint, individually and as assignee of C3, against Gordon Rees, Sinars, Wood, and Furman (collectively referred to as "defense counsel") asserting, among other things, claims for legal malpractice and breach of fiduciary duty. Defense counsel filed CR 12(c) motions for judgment on the pleadings, arguing that they owed no duty to Great American and that Washington should prohibit the assignment of legal malpractice claims. Contemporaneously, Great American filed a motion for partial summary judgment seeking, among other things, an order affirming the validity of C3's assignment of legal malpractice claims to it and striking defense counsel's affirmative defenses asserting the invalidity of the assignment.

---

[1] C3 and Sinars appealed the sanctions order to this court, and we affirmed. Vandivere v. Vertical World, Inc., No. 85568-9-I, slip op. at 1-2 (Wash. Ct. App. Dec. 2, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/855689.pdf.

The superior court granted defense counsel's motion in part, dismissing the direct claims asserted by Great American against them, but denied their motion as to the assigned claims. Correspondingly, the superior court granted in part Great American's motion for partial summary judgment, dismissing defense counsel's affirmative defenses asserting the invalidity of assignment. The superior court granted defense counsel's motion for certification to this court under RAP 2.3(b)(4). The superior court certified the question, "Whether a legal malpractice claim is assignable to a non-adversary in the same litigation that gave rise to the alleged legal malpractice?" A commissioner of this court granted discretionary review.

II

A

Preliminarily, we exercise our discretion to re-frame and narrow the scope of the certified question. See RAP 2.3(e); State v. LG Elecs., Inc., 185 Wn. App. 123, 151, 340 P.3d 915 (2014) (appellate courts determine scope of discretionary review), aff'd, 186 Wn.2d 1, 375 P.3d 636 (2016). Consistent with Washington's case by case approach to the attempted assignment of a legal malpractice claim—which we describe below—it is not necessary to decide if a legal malpractice claim may ever be assigned to a non-adversary. See Kenco Enters. Nw., LLC v. Wiese, 172 Wn. App. 607, 612, 291 P.3d 261 (2013) (Washington follows a case-by-case approach based on public policy to decide assignability of legal malpractice claims). Rather, we address only whether Washington public policy prohibits the insured from assigning a legal malpractice claim against retained defense counsel to their liability insurer where there is potential conflict between the insurer and the

insured, because among other potential reasons the insurer defended under a reservation of rights to deny coverage. Our review of this issue is de novo. <u>Silver</u>, 197 Wn.2d at 542 (CR 12(c) ruling); <u>Rowe v. Klein</u>, 2 Wn. App. 2d 326, 332, 409 P.3d 1152 (2018) (certified question of law).

B

Turning to the certified issue, as reframed, we begin by recognizing the legal principles that guide our inquiry. The insurance relationship is affected by the public interest. <u>Nat'l Sur. Corp. v. Immunex Corp.</u>, 176 Wn.2d 872, 878, 880, 297 P.3d 688 (2013). In the liability insurance setting, the relationship between the insurer, the insured, and defense counsel is sometimes referred to as the tripartite relationship. <u>See</u> <u>Clark County Fire Dist. No. 5 v. Bullivant Houser Bailey, PC</u>, 180 Wn. App. 689, 700, 324 P.3d 743 (2014). "To fulfill its duty to defend, an insurer generally has the right to select the defense counsel who will represent its insured." <u>Kruger-Willis v. Hoffenburg</u>, 198 Wn. App. 408, 416, 393 P.3d 844 (2017). In Washington, "only the *insured* is the client." <u>Tank v. State Farm Fire & Cas. Co.</u>, 105 Wn.2d 381, 388, 715 P.2d 1133 (1986). " '[T]he standards of the legal profession require undeviating fidelity of the lawyer to his client. No exceptions can be tolerated.' " <u>Id.</u> (quoting <u>Van Dyke v. White</u>, 55 Wn.2d 601, 613, 349 P.2d 430 (1960)).

The rule of unitary representation flows from Washington's recognition of a fiduciary duty owed by the insurer to the insured:

> This fiduciary relationship, as the basis of an insurer's duty of good faith, implies more than the "honesty and lawfulness of purpose" which comprises a standard definition of good faith. It implies "a

> broad obligation of fair dealing", [Tyler v. Grange Ins. Ass'n, 3 Wn. App. 167, 173, 473 P.2d 193 (1970)], and a responsibility to give "equal consideration" to the insured's interests. [Id.] at 177. Thus, an insurance company's duty of good faith rises to an even higher level than that of honesty and lawfulness of purpose toward its policyholders: an insurer must deal fairly with an insured, giving equal consideration *in all matters* to the insured's interests.

Tank, 105 Wn.2d at 385-86. Washington law further recognizes the insurer has a fiduciary duty to give the insured equal consideration in all matters as part of the insurer's " 'basic obligations.' " Id. at 387 (quoting Weber v. Biddle, 4 Wn. App. 519, 524, 483 P.2d 155 (1971)).

Where, as here, an insurer defends under a reservation of rights, it must meet both these basic obligations and an additional "enhanced obligation" because of the potential conflicts inherent in this kind of defense. Id. The insurer fulfills its duty by defending the insured, but if the insurer later finds that there is no coverage, it may seek a declaratory judgment that it had no duty to defend and no obligation to pay. Truck Ins. Exch. v. Vanport Homes, Inc., 147 Wn.2d 751, 761, 58 P.3d 276 (2002). The enhanced obligation of Tank includes, among other things, that the insurer retain competent defense counsel representing only the insured as the client. 105 Wn.2d at 388.

Trask v. Butler, 123 Wn.2d 835, 842, 872 P.2d 1080 (1994), established Washington's test "to determine whether an attorney owes a duty to a nonclient." Under this test, "the threshold question is whether the plaintiff is an intended beneficiary of the transaction to which the advice pertained." Id. at 843. "While the answer to the threshold question does not totally resolve the issue, no further inquiry need be made unless such an intent exists." Id. For purposes of whether

7

a nonclient is an intended beneficiary of the representation, the focus is on what the client intends to accomplish through the representation. See Strait v. Kennedy, 103 Wn. App. 626, 633-34, 13 P.3d 671 (2000) (describing court's "inquiry into what [the client] intended to accomplish by virtue of her dissolution action and what her attorney's duties were to her in his representation in that action"). To be an intended beneficiary, it is not enough that a nonclient is an incidental beneficiary. Id. at 631 (citing Trask, 123 Wn.2d at 845). In the event a nonclient meets the threshold test, Trask describes additional factors that the court must then consider. Trask, 123 Wn.2d at 842-43. Consistent with Trask's demanding test, Washington courts have generally been reluctant to extend professional malpractice protection to nonclient third parties because such a duty could create potential conflicts.[2]

Stewart Title Guaranty Co. v. Sterling Savings Bank, 178 Wn.2d 561, 565-67, 311 P.3d 1 (2013), applied the Trask test to the tripartite relationship in the liability insurance setting. In Stewart Title, a builder on a construction site discovered that its mechanic's lien held first position, ahead of a lender's security

---

[2] See McKasson v. State, 55 Wn. App. 18, 28, 776 P.2d 971 (1989); see also Trask, 123 Wn.2d at 845 (an attorney hired by the personal representative of an estate did not owe a duty of care to the estate or the estate beneficiaries); Bowman v. John Doe Two, 104 Wn.2d 181, 188-89, 704 P.2d 140 (1985) (an attorney did not owe a duty of care to his client's adversary, the mother, where the attorney was hired by a child seeking alternative residential placement away from his mother); Leipham v. Adams, 77 Wn. App. 827, 832-34, 894 P.2d 576 (1995) (an attorney did not owe estate beneficiaries a duty of care for failing to file a disclaimer of a joint tenancy interest); Harrington v. Pailthorp, 67 Wn. App. 901, 905-10, 841 P.2d 1258 (1992) (an attorney did not owe a former client's ex-husband a duty of care in a custody modification proceeding); Morgan v. Roller, 58 Wn. App. 728, 732-33, 794 P.2d 1313 (1990) (an attorney did not owe beneficiaries of his former client's testamentary plan a duty of care to disclose the attorney's views of the former client's disability).

interest.  Id. at 564.  In the ensuing foreclosure action, the lender asked its title insurer, Stewart Title, to defend it.  Id.  Stewart Title admitted its duty to defend and hired counsel to do so.  Id.  Defense counsel stipulated that the builder had first priority and sought a swift settlement.  Id.  Stewart Title sued defense counsel for malpractice, arguing that it had neglected to assert a potential defense to the builder's claim of priority.  Id.

The Washington Supreme Court rejected Stewart Title's claim at the threshold level of the Trask test, holding that Stewart Title failed to show that it was an intended beneficiary of defense counsel's services to the insured.  Stewart Title, 178 Wn.2d at 567-68, 570.  The insurer argued that "as long as there is no actual conflict of interest between an insurer and its insured, a nonclient insurer is *presumed* to be an intended beneficiary and 'can bring a claim for malpractice' against its insured's attorney."  Id. at 567.  The court rejected this analysis, because the happenstance of the insurer's and insured's interests aligning was insufficient to meet the threshold inquiry of the Trask test that "the attorney or client *intended* the insurer to benefit from the attorney's representation of the insured."  Stewart Title, 178 Wn.2d at 567.  Recognizing a duty to the insurer based merely on the alignment of interests both would violate Washington's RPC 5.4(c), prohibiting a lawyer from allowing a third party payor to direct or regulate the lawyer's professional judgment and would violate the requirements of Trask.  Stewart Title,

9

178 Wn.2d at 568. The court also found that Sterling Title's retention letter with defense counsel did not meet the Trask test.[3] Stewart Title, 178 Wn.2d at 568-69.

Although not involving the tripartite relationship, one more case, Kommavongsa v. Haskell, 149 Wn.2d 288, 291, 67 P.3d 1068 (2003), speaks to the public policy relevant to the assignment of a legal malpractice claim. In Kommavongsa's underlying case, the defendant settled the plaintiffs' personal injury claim, stipulated to monetary damages of over $12 million, but contributed

---

[3] In Stewart Title, the Washington Supreme Court implicitly recognized that the states vary in approach when it declined to depart from long-settled Washington law based on decisions from other states. 178 Wn.2d at 567 n.2. Some states bar assignment of legal malpractice claims altogether, e.g. Picadilly, Inc. v. Raikos, 582 N.E.2d 338, 343-45 (Ind. 1991), abrogated on other grounds by Liggett v. Young, 877 N.E.2d 178 (Ind. 2007), while others reject limitations on assignment, e.g. Eagle Mountain City v. Parsons Kinghorn & Harris, P.C., 2017 UT 31, 408 P.3d 322, 334.

Similarly, Washington has long followed a rule of unitary representation by defense counsel, Tank, 105 Wn.2d at 388, while some states have recognized a theory of dual representation, e.g. Raymond v. N.C. Police Benevolent Assoc., Inc., 365 N.C. 94, 98, 721 S.E.2d 923 (2011). Stewart Title rejected Restatement (Third) of the Law Governing Lawyers § 51 (2000). 178 Wn.2d at 567 n.2. Comment g to § 51 describes a direct duty of care to the insurer, stating, "Under Subsection (3), a lawyer designated by an insurer to defend an insured owes a duty of care to the insurer with respect to matters as to which the interests of the insurer and insured are not in conflict, whether or not the insurer is held to be a co-client of the lawyer." But besides having been rejected in Washington, this duty is usually limited to situations in which the insurer and the insured are not in conflict. E.g. Unigard Ins. Grp. v. O'Flaherty & Belgum, 38 Cal. App. 4th 1229, 1236-37, 45 Cal. Rptr. 2d 565 (1995) (absent coverage dispute or other conflict, defense counsel has dual attorney-client relationship with insurer and insured). In Stewart Title, the insurer confined its argument to seeking a direct duty only "as long as there is no actual conflict of interest between an insurer and its insured." 178 Wn.2d at 567. Here, where there is a clear conflict between the insurer and the insured, even if the Supreme Court had accepted the insurer's argument in Stewart Title, it would not follow that Great American could pursue the claims it seeks to pursue.

But review of out-of-state decisions primarily reinforces that the states have taken disparate approaches. Like the Supreme Court in Stewart Title, we conclude that existing and long-standing Washington law controls the outcome here.

only his policy limits of $50,000 in exchange for a covenant not to execute the judgment and the assignment of his legal malpractice claims against his attorney. Id. at 293. The injured plaintiffs, as assignees holding the legal malpractice claims, sought to recover on the stipulated judgment from the defendant's attorney. Id. at 293-94. The court held that assignment of legal malpractice claims to an adversary in the same litigation that gave rise to the alleged legal malpractice violated public policy. Id. at 291.

The court noted that though "assignability is the general rule," many jurisdictions have limited the assignability of legal malpractice claims for public policy reasons. Id. at 295-96. Three rationales persuaded the court to prohibit assignment in Kommavongsa's context: (1) risk of collusion; (2) the "trial within a trial," which follows the assignment where parties who had argued one position in the underlying case "shameless[ly] shift" their position in the subsequent legal malpractice suit, demeaning the legal profession; and (3) permitting assignment would deter lawyers from representing defendants "who are judgment-proof or nearly so, and who are uninsured or underinsured," because doing so "might place them, their malpractice insurers and their assets within reach of plaintiffs who otherwise might have an uncollectible judgment."[4] Id. at 307, 310. Kommavongsa therefore prohibited the assignment of legal malpractice claims to adversaries in the same litigation that gave rise to the alleged malpractice. Id. at 311.

---

[4] The court considered two other policy rationales, which it said "may be overstated," those being that (4) permitting assignment would compromise attorney-client confidences, and (5) that a "lucrative business" of factoring malpractice claims would arise and encourage unjustified lawsuits. Kommavongsa, 149 Wn.2d at 306-07.

C

Applying the above legal principles to the tripartite relationship, we conclude that Washington law does not permit C3 to assign to Great American its legal malpractice claims against defense counsel. Trask and Tank confine the lawyer's duty to the client in the manner that they do to ensure that counsel will protect the client's interests without competing loyalties. Trask, 123 Wn.2d at 844 ("The policy considerations against finding a duty to a nonclient are strongest where doing so would detract from the attorney's ethical obligations to the client."); Tank, 105 Wn.2d at 388 ("potential conflicts of interest between insurer and insured must be fully disclosed and resolved in favor of the insured"). The assignment in this case, if permitted, would allow Great American through the malpractice claim to reexamine defense counsel's handling of the defense. As a practical matter, when defending C3, defense counsel would need to consider both C3's interests and the insurer's ability to later challenge counsel's decisions as malpractice. This would give the insurer the very sway over defense counsel's decisions that Trask and Tank sought to prevent.

Two potential conflicts between the insured and the liability insurer (but not the only ones) occur when a claim exceeds the available insurance limits and when the litigation of the underlying claim would affect the availability of coverage. In Weber, 4 Wn. App. at 521, the insured defendant "gave two versions" of a motor vehicle accident to her insurer, one stating that she was driving the car and ran a red light, and another stating that "a 17-year-old boy was driving without her consent and against her wishes." The second version, if true, would have

12

precluded coverage and exempted her and the insurance company from any liability. Id. After trial resulted in a verdict above the insurance limits, the insurer argued that it did not need to cover the insured's excess liability because it could justifiably rely on the version of events more favorable to its interests, rather than risk that the other version might be believed. Id. In Mutual of Enumclaw Insurance Co. v. T&G Construction, Inc., 165 Wn.2d 255, 259, 199 P.3d 376 (2008), the liability insurer believed "its insured should have prevailed on an affirmative defense," and while the judge in the underlying case "rejected the proffered affirmative defense several times," the insurer continued to argue that it was not required to cover a settlement where the defense "was never litigated to absolute finality." And Stewart Title implied that the insured defendant preferred a swift, reasonable settlement over the liability insurer's interest in pursuing a potential defense to liability. 178 Wn.2d at 567.

Washington imposes fiduciary responsibility on the insurer among other reasons because, typically, it retains control over the defense. Weber, 4 Wn. App. at 525. Tank's rule of unitary representation, and Stewart Title's application of Trask's rule of the intended beneficiary, both give effect to the liability insurer's fiduciary responsibility. Under Tank and Stewart Title, in all three situations noted above—the competing versions of the facts in Weber and the affirmative defenses that could defeat the claim but if unsuccessful could exacerbate the liability in T&G and Stewart Title—defense counsel's sole loyalty was to the insured client. But under the assignment Great American seeks to pursue here, in all three situations defense counsel would have needed to decide how to pursue the defense while

also facing the possibility that the insurer, later, would second guess those same defense decisions as legal malpractice.

This is true even though defense counsel's legal duty, even after the assignment, runs only to the client. While the duty to the client defines the scope of the lawyer's responsibility, once the assignment is complete, it is the liability insurer through the complaint and development of expert testimony that would shape and characterize the assertions of negligence by counsel. In all three situations above, pursuing the alternative defenses preferred by the insurers was characterizable as serving the client's interests—after all, the alternative defenses potentially defeated liability. At the same time, in all three situations above, the client's interests lay in reasonably settling within limits. Washington law is clear that defense counsel must serve the insured's interests, and only the insured's. See Tank, 105 Wn.2d at 388. Where there is potential conflict between the liability insurer and the insured defendant, as there is when there is a reservation of rights to deny coverage, allowing assignment of the insured's legal malpractice claims to the liability insurer would create the competing loyalties for defense counsel that Stewart Title, Trask, and Tank sought to eliminate.

Kommavongsa also counsels against Great American's position. It was concerned with the adversarial relationship between the parties. Kommavongsa, 149 Wn.2d at 311. Although there was the potential for conflict between Great American and C3 because of the reservation of rights, they were not litigation adversaries. The first two policy concerns that Kommavongsa found compelling are present here only to a lesser degree. 149 Wn.2d at 307. In the absence of a

14

covenant settlement, the risk of collusion leading to an inflated settlement is not present. See Chaussee v. Md. Cas. Co., 60 Wn. App. 504, 510-11, 803 P.2d 1339, 812 P.2d 487 (1991) (When an insured agrees to a covenant settlement they "may settle for an inflated amount to escape exposure and thus call into question the reasonableness of the settlement."). There is nevertheless some possibility of collusion, to the extent the insurer and the insured may attempt to leverage defense counsel's alleged liability exposure to spread the cost of the insurer's responsibility to settle. And Kommavongsa's second concern, with unseemly shifts in position, 149 Wn.2d at 308-09, is present, to a limited degree. In the underlying case, through its defense of C3, Great American pursued the argument that C3 was not required to make the discovery disclosures that were the subject of the sanctions motion, whereas now it says that not making the disclosures was legal malpractice.

But Kommavongsa's third concern is fully present here. The court was concerned about the willingness of defense counsel to accept defense in cases where the defendant's liability likely exceeds their assets, their coverage, or both. Id. at 307. This was because in situations where the claim exceeds the defendant's ability to pay, defense counsel's accepting the representation "might place them, their malpractice insurers and their assets within reach of plaintiffs who otherwise might have an uncollectible judgment." Id. at 310. Kommonvongsa sought to avoid defense counsel's assets becoming a new fund available for the potential settlement of the underlying case. Id. at 305, 310. Great American's proposed assignment would undermine that goal.

Great American argues that precluding the insured from assigning legal malpractice claims to its insurer fails to deter legal malpractice because the insured lacks the incentive to sue and the insurer is unable to do so. We find this argument unpersuasive for two reasons. First, the insured remains able to sue defense counsel, so the disincentive against negligence intended by tort law is not absent. See Swank v. Valley Christian Sch., 188 Wn.2d 663, 679-80, 398 P.3d 1108 (2017) ("One of the major purposes of tort law is to encourage people to act with reasonable care and for the welfare of themselves and others."). Second, within the tripartite relationship, the insurer already typically retains control over the defense, Weber, 4 Wn. App. at 525, and generally selects defense counsel, Kruger-Willis, 198 Wn. App. at 416. An illustrative situation was discussed in Arden v. Forsberg & Umlauf, PS, 189 Wn.2d 315, 320, 402 P.3d 245 (2017), where the court analyzed defense counsel's responsibilities where counsel "had an established relationship" with the insurer that included representing the insurer on coverage matters as well as representing its insureds. Through its control of the defense, ability to select counsel, and relationship with counsel—and the ability to terminate the relationship—the insurer is in a position to protect itself from risks of legal malpractice.

Kommavongsa held that assignability is the general rule and declined to adopt a blanket prohibition against assignment of legal malpractice claims. 149 Wn.2d at 295-96, 306-07. We confine our holding today to the unique tripartite relationship that arises when a liability insurer retains defense counsel to defend its insured against a third party claim, and there is a possibility of conflict between

the interests of the insurer and the insured—a possibility that is present when the insurer reserves rights to deny coverage. Thus, we do not address the possibility of assignment within the tripartite relationship where the insurer can demonstrate that it accepted defense unconditionally and throughout the defense of the underlying claim there was no possibility of conflict between the insurer and the insured. But where there is potential conflict between the liability insurer and the insured, as there is where the insurer defended under a reservation of rights to deny coverage, the insured's assignment to the insurer of legal malpractice claims against retained defense counsel is prohibited by Washington public policy established in <u>Stewart Title</u>, <u>Trask</u>, and <u>Tank</u> guaranteeing undivided loyalty to the client.

III

We reverse and remand with instructions to dismiss Great American's claims against defense counsel assigned from C3 and otherwise for proceedings consistent with this opinion.

_____
Birk, J.

WE CONCUR:

_____   _____
Feldman, J.                   Coburn, J.